**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| TRACEY DAMRAU, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> COLIBRI GROUP, LLC. <br><br> Defendant. | Case No. 4:24-cv-01441-SEP <br><br> **JURY TRIAL DEMANDED** <br><br> **ORAL ARGUMENT REQUESTED** |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**


Dated: January 23, 2025

/s IJay Palansky_____
IJay Palansky (*pro hac vice*)
ipalansky@atllp.com
ARMSTRONG TEASDALE LLP
4642 S. Ulster Street, Suite 800
Denver, Colorado 80237
(720) 200-0676

Paul Croker (Bar #57000)
Nick Slovikoski (Bar #73019)
pcroker@atllp.com
nslovikoski@atllp.com
ARMSTRONG TEASDALE LLP
2345 Grand Blvd., Suite 1500
Kansas City, Missouri 64108
Telephone: 816.221.3420
Fax: 816.221.0786

COUNSEL FOR COLIBRI GROUP, LLC

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................ 1

BACKGROUND .......................................................................................................................... 3

    A.    The Websites .......................................................................................................... 3

    B.    Defendant ................................................................................................................ 3

    C.    The Meta and TikTok Pixels .................................................................................. 4

    D.    Plaintiffs ................................................................................................................. 4

    E.    The Claim and Proposed Classes ........................................................................... 5

ARGUMENT ................................................................................................................................. 5

    I.    Colibri Group, LLC, Is The Wrong Defendant. .............................................. 6

    II.    The Complaint's Attempt To Plead A VPPA Claim Fails In
        Multiple Ways. ..................................................................................................... 8

        A.    The VPPA's Text And Legislative History Indicate Video
            Tape Service Providers Are Limited To Providers Of Pre-
            Recorded Materials "Similar" To Movies, Not
            Educational Videos Like Those On The Websites. ............................ 9

        B.    The Disclosed Information Is Not PII Because It Does Not
            Identify "Specific Video Materials or Services," As
            Required By The Statute. ................................................................... 12

        C.    An Ordinary Person Could Not Identify PII From The
            Allegedly Disclosed Information. ...................................................... 13

CONCLUSION ............................................................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aldana v. Gamestop, Inc.*,
  No. 22-CV-7063-LTS, 2024 WL 708589 (S.D.N.Y. Feb. 21, 2024) ......................................11

*Bell v. Emp. Connection*,
  No. 4:23-cv-00267-SEP, 2024 WL 1253820 (E.D. Mo. Mar. 25, 2024) ................................5

*Doe 1631 v. Quest Diagnostics, Inc.*,
  395 S.W.3d 8 (Mo. banc 2013) .............................................................................................6

*DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*,
  747 F.3d145 (2d Cir. 2014) ..................................................................................................14

*Edwards v. Learfield Commc'ns, LLC*,
  697 F. Supp. 3d 1297 (N.D. Fla. 2023) ................................................................................15

*Eichenberger v. ESPN, Inc.*,
  876 F.3d 979 (9th Cir. 2017) .................................................................................11, 12, 14

*Ellis v. Cartoon Network, Inc.*,
  803 F.3d 1251 (11th Cir. 2015) ........................................................................................1, 8

*State ex rel. Ford Motor Co. v. Bacon*,
  63 S.W.3d 641 (Mo. banc 2002) ..........................................................................................6

*Goellner-Grant v. Platinum Equity LLC*,
  341 F. Supp. 3d 1022 (E.D. Mo. 2018) ...........................................................................7, 8

*Gonzalez v. Central Elec. Co-op, Inc.*,
  Civ. Nos. 08–6236–HO, 08–6240–HO, 2009 WL 3415235 (D. Or. Oct. 15,
  2009) ....................................................................................................................................13

*In re Hulu Priv. Litig.*,
  86 F. Supp. 3d 1090 (N.D. Cal. 2015) ................................................................................13

*Martinez v. D2C, LLC*,
  No. 23-21394-CIV, 2023 WL 6587308 (S.D. Fla. Oct. 10, 2023) .......................................12

*Mid-Mo. Tel. Co. v. Alma Tel. Co.*,
  18 S.W.3d 578 (Mo. App. W.D. 2000) .................................................................................6

*Mollett v. Netflix, Inc.*,
  795 F.3d 1062 (9th Cir. 2015) ..............................................................................................9

*In re Nickelodeon Consumer Privacy Litig.*,
   827 F.3d 262 (3d Cir. 2016) ............................................................................................ 1, 12, 14

*U.S., ex rel. Polansky v. Exec. Health Res., Inc.*,
   599 U.S. 419 (2023) ................................................................................................................ 11

*Raimo v. Wash. Univ. in St. Louis*,
   No. 4:20-CV-00634-SEP, 2022 WL 796239 (E.D. Mo. Mar. 16, 2022) ................................. 9

*SAS Inst., Inc. v. Iancu*,
   584 U.S. 357 (2018) ................................................................................................................ 11

*Sprint Spectrum L.P. v. AT&T Commc'ns, Inc.*,
   No. 00–0973–CV–W–5, 2001 WL 36143293 (W.D. Mo. Feb. 8, 2001) ................................. 6

*United States v. Bestfoods*,
   524 U.S. 51 (1998) .................................................................................................................... 6

*United States v. Stanko*,
   491 F.3d 408 (8th Cir. 2007) .................................................................................................. 10

*Weitz Co. v. MH Washington*,
   631 F.3d 510 (8th Cir. 2011) .................................................................................................... 7

*Williams v. FCA US LLC*,
   No. 17-CV-00844-W-DW, 2018 WL 3973075 (W.D. Mo. Apr. 16, 2018) ............................ 14

*Wilson v. Triller, Inc.*,
   598 F. Supp. 3d 82 (S.D.N.Y. 2022) .................................................................................. 2, 14

*Yershov v. Gannett Satellite Info. Network, Inc.*,
   820 F.3d 482 (1st Cir. 2016) .................................................................................................. 14

**Statutes**

18 U.S.C. § 2710(a) ......................................................................................................................... 1

18 U.S.C. § 2710(a)(3) ......................................................................................................... 9, 12, 13

18 U.S.C. § 2710(a)(4) ......................................................................................................... 9, 10, 11

18 U.S.C. § 2710(b) ......................................................................................................................... 9

**INTRODUCTION**

As Judge Robert Bork's Supreme Court confirmation hearings were approaching in 1987, a reporter visited the judge's local video store and asked for a list of the movies he had recently rented. The store clerk complied, and the reporter's newspaper published the list of 146 specific movie tapes Bork's family had rented over the previous two years. *See* Andrea Peterson, How Washington's Last Remaining Video Rental Store Changed the Course of Privacy Law, WASHINGTON POST (Apr. 28, 2014).[1] Distressed by this invasion of privacy and seeking to ensure that movie viewing habits could not again be weaponized to attack individuals' characters or embarrass them through public disclosure, the following year Congress passed the Video Privacy Protection Act ("VPPA"). *See, e.g.*, *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1252-53 (11th Cir. 2015).

The VPPA is a relatively straightforward statute. Consistent with its purpose, it proscribes "video tape service providers" ("VTSPs") from knowingly disclosing "personally identifiable information" ("PII")—specifically, information that identifies a consumer and the specific "*video cassette tapes or similar audio visual materials*" they purchased or rented—without the consumer's consent. 18 U.S.C. § 2710(a) (emphasis added). Violations are subject to statutory penalties of $2,500 and attorney's fees. *Id.* § 2710(c).

Congress intended for this law to be "quite narrow." *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 284-85 (3d Cir. 2016). But recently, in an effort to exploit the VPPA's severe remedies, plaintiff's attorneys have sought to apply the VPPA exceptionally broadly, bringing nationwide class actions seeking tens or hundreds of millions of dollars against a wide swath of

---

[1] https://www.washingtonpost.com/news/the-switch/wp/2014/04/28/how-washingtons-last-remaining-video-rental-store-changed-the-course-of-privacy-law/ (last visited Jan 22, 2025).

1

entities that provide virtually *any* form of prerecorded video on the Internet. For example, this case involves websites that provide *educational videos*, not movies like one would find on video cassette tapes, which is the focus of the statute. (*See* Am. Compl. ¶ 33).

Such corruption of the VPPA is made possible by a quirk in modern websites' ordinary back-end functionality, combined with ambiguous, "not well drafted" language in the VPPA, in particular in the definitions of VTSPs and PII. *Wilson v. Triller, Inc.*, 598 F. Supp. 3d 82, 90 (S.D.N.Y. 2022) (citation omitted). Plaintiffs' Amended Class Action Complaint (Dkt. #15) ("Complaint") alleges that, like many websites, the websites at issue here ("Websites") use small pieces of code called "Pixels." These Pixels transmit aspects of users' Internet activity to third parties. According to the Complaint, the Pixels on the Websites disclosed information to Meta and TikTok, including (i) Plaintiffs' and putative class members' "Facebook IDs" or cell phone numbers, and (ii) information about the subscriptions or videos they purchased or accessed.

In today's hyper-connected world, surely few if any Internet users would be surprised to learn that their browsing, viewing, or transaction activity is shared. In fact, the Complaint does not allege Plaintiffs were harmed. It does not allege that *anyone*—whether at Facebook, TikTok, or otherwise—actually saw consumers' video viewing history, let alone that any consumer's information was ever disclosed to the public, or that any consumer suffered financial, emotional, or other injury. Nevertheless, the Complaint asserts that the unexceptional, ordinary operation of the ubiquitous Pixels violates the VPPA and subjects Defendant to massive statutory penalties.

The Court should reject the Complaint's misapplication of the VPPA to disclosure of information about consumers' viewing of educational videos, in particular when that information was never made public. The purpose, language, and legislative history of the statute demonstrate that what the Complaint protests is not what the VPPA intended to punish.

2

The Complaint also fails to plead its claim for several additional reasons. First, Colibri Group, LLC ("Defendant") does not own or control the Websites or disclosures at issue, and so is not the proper defendant. Second, the Complaint fails to allege that the disclosures specifically identified the videos Plaintiffs accessed. Third, the Complaint makes clear that the alleged disclosures would not allow an ordinary person to identify Plaintiffs' PII.

## BACKGROUND

### A.  The Websites

The Complaint[2] alleges that disclosures were made by Meta and TikTok Pixels on "Colibri Group" websites "including but not limited to the www.elitelearning.com website, the www.homeceuconnection.com, the www.colibrirealestate.com website, the www.mckissock.com website, and the www.fhea.com website." (Am. Compl. ¶ 2) (collectively the "Websites"). These Websites provide *educational* materials "from various industries, including nursing, heathcare, home inspection, engineering, appraisal, social work, occupational therapy, pharmacy, counseling, and other fields." (*Id.* ¶ 33).

### B.  Defendant

Although it does not own or operate the Websites, the Complaint names Colibri Group, LLC as the Defendant based on the allegation that Colibri Group, LLC "is the parent company that specifically governs several companies and brands," which operate and control the Websites. (*Id.* ¶ 34). That allegation is incorrect. Colibri Group, LLC, is not the parent of, and does not control, the Websites.

Aside from the Complaint's unsupported—and incorrect—allegation that Colibri Group,

---

[2] Plaintiffs filed the original complaint on October 25, 2024 (Dkt. #1). Defendant filed a motion to dismiss on December 19, 2024. (Dkt. #13 and #14). Rather than opposing that motion, Plaintiffs filed an Amended Complaint on January 9, 2025.

LLC "specifically governs" the companies and brands that control the Websites, the only other allegations speaking to any aspect of control of the Websites by Colibri Group, LLC, are that "Defendant's Privacy Policy refers to each individual website as being 'part of the Colibri Group portfolio of companies and brands'" (*id.* ¶ 36), and that the Websites' Privacy Policy directs questions to privacy@colibrigroup.com (*id.* ¶ 37). The Complaint does not allege any facts indicating that Colibri Group LLC controls the Websites or the companies that own them, as required to pierce the corporate veil.

C.   **The Meta and TikTok Pixels**

The Complaint asserts that the disclosures in question were executed by two programming codes installed on the Websites: the "Meta Pixel" and "TikTok Pixel." (*Id.* ¶ 2).

It alleges that the *Meta* Pixel was installed on each of the Websites and that it disclosed Plaintiff Damrau's Facebook ID ("FID") along with either the subscription or video title Damrau accessed. (*Id.* ¶¶ 4, 17). It further alleges that a FID can be used to identify a consumer's Meta Profile or Facebook page. (*Id.* ¶ 4).

The Complaint alleges that the *TikTok* Pixel was installed on the elitelearning.com and colibrirealestate.com Websites (*id.* ¶ 116), and that it disclosed Plaintiffs' "cellular telephone number and the subscription to access prerecorded videos or the specific title of prerecorded videos that each of [Defendant's] customers purchased…." (*Id.* ¶ 5).

D.   **Plaintiffs**

According to the Complaint, Plaintiff Damrau is a resident of Suffolk County, NY. (*Id.* ¶ 9). "[O]n or about July 6, 2024, Plaintiff Damrau purchased an all-access subscription to access prerecorded video material from Defendant's [elitelearning.com] website…." (*Id.* ¶ 11). It appears this subscription was the "NY Social Work All Access Pass," which Damrau used to obtain unspecified "pre-recorded videos from Defendant." (*Id.* ¶¶ 12, 16). During this time period,

4

Damrau allegedly had a Meta account and profile, and a TikTok account and profile. (*Id.* ¶¶ 13-14). The Complaint claims that once Damrau completed her purchases, "the 'purchase' event code was sent to Meta alongside [Damrau's FID] within the same session as the specific title of the prerecorded video material or subscription, product code, and her request to join." (*Id.* ¶ 17).

The Complaint alleges Plaintiff Oshea, a resident of Suffolk County, NY, purchased prerecorded video content from the website www.elitelearning.com, including the "Managing Professional Boundaries" course, and that Defendant disclosed that information, along with Oshea's cellphone number, to TikTok through the TikTok Pixel. (*Id.* ¶¶ 20, 22, 25).

### E.   The Claim and Proposed Classes

The Complaint asserts a single claim for violation of the VPPA on behalf of Plaintiffs and two proposed classes. First, a class consisting of "[a]ll persons in the United States who, during the two years preceding the filing of this action, purchased prerecorded video material or a subscription to access prerecorded video material or services from any one of Defendant's portfolio of Websites while maintaining an account with *Meta Platforms*, Inc. f/k/a Facebook, Inc. and Instagram." (*Id.* ¶ 115 (emphasis added)). Second, a similarly defined class who purchased prerecorded videos or subscriptions from www.elitelearning.com or www.colibrirealestate.com websites while maintaining an account with *TikTok*. (*Id.* ¶ 116 (emphasis added)).

## ARGUMENT

"To survive a motion to dismiss, the complaint must allege facts supporting each element of the plaintiff's claims, and the claims cannot rest on mere speculation. Specifically, the complaint must allege more than '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements' and instead must 'allege sufficient facts that, taken as true, state a claim to relief that is plausible on its face.'" *Bell v. Emp. Connection*, No. 4:23-cv-00267-SEP, 2024 WL 1253820, at *2 (E.D. Mo. Mar. 25, 2024) (Pitlyk, J.) (citing *Bell Atlantic Corp. v.*

5

*Twombly*, 550 U.S. 544, 555 (2007), and quoting *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1057 (8th Cir. 2017)).

I.  **COLIBRI GROUP, LLC, IS THE WRONG DEFENDANT.**

The proper defendant in any lawsuit is the entity or individual that performed or was responsible for the conduct in question. *See, e.g.*, *Sprint Spectrum L.P. v. AT&T Commc'ns, Inc.*, No. 00–0973–CV–W–5, 2001 WL 36143293, at *4 (W.D. Mo. Feb. 8, 2001) (dismissing party that was not the "real party in interest"). Here, that is not Colibri Group, LLC.

The Complaint's naming of Colibri Group, LLC as the defendant appears to be based on Plaintiffs' (mis)understanding that "Colibri Group" is the "parent company" of the companies that actually own and control the Websites. (Am. Compl. ¶ 34). But Colibri Group, LLC, is not the parent company for any of the Websites referenced in the Complaint and does not control them.

Even if Colibri Group, LLC were the parent to the companies governing the Websites, "[i]t is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation … is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (internal quotation omitted). Missouri law recognizes only two exceptions to this rule. First, when the parent is the *alter ego* of the subsidiary, *Mid-Mo. Tel. Co. v. Alma Tel. Co.*, 18 S.W.3d 578, 582 (Mo. App. W.D. 2000); and second, when a principal-agent relationship is established between a parent and its subsidiary. *See State ex rel. Ford Motor Co. v. Bacon*, 63 S.W.3d 641, 642 (Mo. banc 2002). A key element to both exceptions is the parent's extensive control. For *alter ego* liability, the parent must possess "complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own…." *Doe 1631 v. Quest Diagnostics, Inc.*, 395 S.W.3d 8, 18 (Mo. banc 2013). For agency liability, the parent must exercise "such domination and control that the controlled corporation has … no separate

6

mind, will or existence of its own and is but a business conduit for its principal." *Weitz Co. v. MH Washington*, 631 F.3d 510, 522 (8th Cir. 2011).

The Complaint alleges no facts supporting such domination and control. The relevant allegations are (i) that "Defendant is the parent company that specifically governs" the companies and brands that control the Websites (Am. Compl. ¶ 34); (ii) that "Defendant's Privacy Policy refers to each individual website as being 'part of the Colibri Group portfolio of companies and brands' demonstrating its parental control, governance, and operation of the respective data collection practices for each website and leaving no autonomy to the subsidiary Websites" (*id.* ¶ 36); and (iii) that the Websites' Privacy Policy directs questions to privacy@colibrigroup.com (*id.* ¶ 37).

These allegations fail to plead *alter ego* or agency liability. The conclusory allegation that Defendant is the parent is not sufficient; if it were, *every* parent would be liable for the conduct of its subsidiaries, turning the rule on its head and negating the protection provided by the corporate form. *See, e.g.*, *Goellner-Grant v. Platinum Equity LLC*, 341 F. Supp. 3d 1022, 1029 (E.D. Mo. 2018) (holding that far more than a parent-subsidiary relationship is required: "the question to be answered for alter-ego liability is whether [the parent] so totally and manifestly *dominated* and *controlled* [the subsidiary] that it is reasonable to disregard [the subsidiary's] corporate form and hold [the parent] directly liable as if it had acted on its own.") (emphasis in original).

The second allegation—that the Websites' Privacy Policies state that they are "part of the Colibri Group portfolio" and, therefore, Colibri controls and "leave[s] no autonomy for" the Websites—is a *non sequitur*. A privacy policy's statement that a website is part of a "portfolio" does not speak to, let alone establish, the "complete domination" of a subsidiary's actions, or the absence of a "separate mind, will or existence of [the Website's] own" necessary to plead the *alter*

7

*ego* and agency exceptions. At most, it reiterates that same erroneous logic as the first allegation: that Colibri Group, LLC is liable because it is (supposedly) the parent. The third allegation—that the Websites' Privacy Policies direct inquiries to the same email address—similarly says nothing about any control or domination by Colibri Group, LLC. It simply indicates that the Websites streamline their process for responding to consumer inquiries. The allegation does not suggest that each Website lacks autonomy over its own site or business. *See, e.g.*, *id.* at 1029 (holding parent company was not alter ego of subsidiary, and noting that even "use of integrated sales system, integrated IT and HR departments, common marketing images, and joint use of trademarked logos fail to establish an alter-ego where none of these things demonstrate high-level operational control over a subsidiary") (citing *In Re Enter. Rent-a-Car Wage & Hour Emp. Practices Litig.*, 735 F. Supp. 2d 277, 323 (W.D. Pa. 2010)).

Even if Defendant were the parent company (which it isn't), the Complaint fails to plead facts showing the extensive domination and control necessary to pierce the corporate veil. The Court should therefore dismiss the Complaint in its entirety because it names a defendant that is not responsible for the conduct at issue.

## II.    THE COMPLAINT'S ATTEMPT TO PLEAD A VPPA CLAIM FAILS IN MULTIPLE WAYS.

The VPPA was passed in 1988 in response to the publication of the movie video rental history of Judge Robert Bork, in connection with his 1987 Supreme Court confirmation hearing:

> Congress enacted the VPPA in 1988 after a newspaper "published a profile of [Supreme Court nominee and then D.C. Circuit] Judge Robert H. Bork" which contained the titles of 146 films he and his family had rented from a local video store.… Senator Patrick Leahy explained that the new law was meant to protect "our right to privacy [in] the choice of *movies* that we watch with our family in our own homes…."

*Ellis*, 803 F.3d at 1252-53 (emphasis added) (quoting 134 Cong. Rec. S5396–08, S. 2361 (May 10, 1988)).

8

The VPPA provides a consumer with a cause of action if a "video tape service provider" knowingly discloses the consumer's PII without the consumer's consent. 18 U.S.C. § 2710(b); *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015) ("in order to plead a plausible claim under [the VPPA], a plaintiff must allege that (1) a defendant is a 'video tape service provider,' (2) the defendant disclosed [PII] concerning any customer' to 'any person,' (3) the disclosure was made knowingly, and (4) the disclosure was not authorized [by the consumer]").

The statute defines "video tape service provider" to be "any person, engaged in the business … of rental, sale, or delivery of prerecorded *video cassette tapes or similar audio visual materials*." 18 U.S.C. § 2710(a)(4) (emphasis added). The statute defines "personally identifiable information" to "include information which identifies a person as having requested or obtained *specific* video materials or services from a video tape service provider…." *Id.* § 2710(a)(3) (emphasis added).

### A. The VPPA's Text And Legislative History Indicate Video Tape Service Providers Are Limited To Providers Of Pre-Recorded Materials "Similar" To Movies, Not Educational Videos Like Those On The Websites.

The VPPA was intended to address conduct very different than alleged in the Complaint.[3] Sparked by the newspaper article about Judge Bork, the VPPA was intended to prevent attacks on

---

[3] The Complaint alleges that "Defendant did not notify [Plaintiffs] that it would disclose the Private Viewing Information of its customers." (Am. Compl. ¶¶ 18, 31). That allegation is demonstrably false. The Websites' Cookie Policies—a link to which is on each Website's homepage—specifically state that the Websites use their "advertising partners'" third party cookies "to build a profile of your interests and show you relevant ads on other websites." *See, e.g.*, https://www.elitelearning.com/online-cookie-policy/ (last visited January 21, 2025); https://www.mckissock.com/online-cookie-policy/ (last visited January 21, 2025). Relatedly, the Website's Privacy Policies—also linked on each Website's homepage—state that the Websites "collect, use, process, and disclose your information for a variety of reasons, including … deliver[ing] marketing communications and promotional materials that you may be interested in." https://www.elitelearning.com/privacy-policy/ (last visited January 2, 2025). The Court may consider these webpages in deciding the motion to dismiss because they are incorporated by reference in the Complaint through the Complaint's extensive references to the Websites generally and specific references to their Privacy Policies. *See, e.g.*, *Raimo v. Wash. Univ. in St. Louis*, No. 4:20-CV-00634-SEP, 2022 WL 796239, at *5 n.5 (E.D. Mo. Mar. 16, 2022) (Pitlyk, J.); *see also* (Am. Compl. ¶¶ 36, 37).

9

individuals' character through *public* disclosure of their *movie* viewing habits.

The formal title of the statute—"Wrongful disclosure of video tape rental or sales records"—clearly reflects this focus. As does the statutory language itself: Congress restricted the scope of VTSPs to entities that rent or sell materials "similar" to "prerecorded video cassette tapes." *Id.* § 2710(a)(4) (emphasis added). The word "similar" is limiting: "Congress use[s] the comparative term 'similar' to … indicate[] an intent to limit the … clause's reach to offenses which are 'comparable' or 'nearly corresponding' to the [specified conduct]." *See United States v. Stanko*, 491 F.3d 408, 414 (8th Cir. 2007) (emphasis added) (citation omitted).

The legislative record for the statute's passage similarly emphasizes that the VPPA was designed to prevent disclosure of *movies* individuals viewed:

- "The *movies* we view in the privacy of our home … may reveal sensitive, personal information about us and should not be disclosed absent a compelling State interest…." Video and Library Privacy Protection Act of 1988: Joint Hearing on H.R. 4947 and S. 2361 Before the Subcomm. on Cts., C.L., & the Admin. of Just. of the H. Comm. on the Judiciary and the Subcomm. on Tech. & the Law of the S. Comm. on the Judiciary, 100th Cong. 54 (1998) ("1988 VPPA Joint Hearing") (emphasis added).

- **"**[A] person would have to consent to the—to a release of such information as the precise titles of *movies* taken out of a video store." *Id.* at 32 (emphasis added).

- "There's a gut feeling that people ought to be able to read books and watch *films* without the whole world knowing. Books and *films* are the intellectual vitamins that fuel the growth of individual thought." *Id.* at 27.

- **"**The term 'video tape service provider' means any person engaged in the business … of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials, *such as laser disks, open-reel movies, or CDI technology*…." S. Rep. No. 100-599 (1988), at 12 (emphasis added).

The Complaint itself notes that the purpose of the VPPA was to "protect[] the choice of *movies* that we watch with our family in our own home." (Am. Compl. ¶ 43 (emphasis added)). The Complaint's interpretation of this foundational issue disregards the statutory language and legislative history by targeting the alleged disclosure of consumers' viewing of not movies, but

10

educational videos. Rather than limiting Plaintiffs' VPPA claim to videos "similar" to "prerecorded video cassette tapes," 18 U.S.C. § 2710(a)(4), the Complaint appears to take the position that *any* video qualifies. (*See Am. Compl. passim* (generically referring to the videos at issue as prerecorded "videos," "video content," or "video material")). The statute clearly is not so broad. It would have been exceedingly simple for Congress to have defined VTSPs to encompass distributors of *any* video. Congress chose not to, instead using the unwieldy clause "video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). That deliberate, unconventional language must be given effect. *See, e.g.*, *U.S., ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 431 (2023) (emphasizing "the interpretive principle that every clause and word of a statute should have meaning") (internal quotations omitted); *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 364 (2018) ("'Congress' choice of words is presumed to be deliberate and deserving of judicial respect.") (internal quotations omitted).

At least one court has recognized that the VPPA is limited to videos similar to movies, explaining:

> While Congress explicitly recognized that these privacy values extend past *films*— by repeatedly referencing books—*Congress ultimately chose not to extend these protections to other materials*…. The Senate Report … indicates that 'similar audio visual material' refers more *narrowly* to prerecorded videos that *are films or have similar content rather than the generic world of audio visual materials that are pre-recorded*, full stop.

*Aldana v. Gamestop, Inc.*, No. 22-CV-7063-LTS, 2024 WL 708589, at *5 (S.D.N.Y. Feb. 21, 2024) (emphasis added) (internal citations omitted); *see also Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017) (observing generally, "we are not persuaded that the 1988 Congress intended for the VPPA to cover circumstances so different from the ones that motivated its passage").

The conduct alleged here falls outside the VPPA. The Websites provide educational

11

material, not films. There is no suggestion that any disclosure has been or would be used to attack anyone's character. Nor is there any allegation that any PII disclosed by the Websites is made public. To the contrary, if anything, one would think that consumers themselves might—routinely and voluntarily—disclose that they viewed the Websites' content in order to satisfy continuing education requirements or for other purposes. *See* https://www.elitelearning.com/privacy-policy/ (last visited Jan. 21, 2025) (noting that consumers' information may be shared with government agencies and accrediting bodies).

Plaintiffs' theory suggests no limit to the nature of videos within the VPPA's scope, thus contradicting the statute's language, purpose, and legislative history. Educational videos are not covered. The Websites are not "video tape service providers"; therefore, Plaintiffs' claim should be dismissed with prejudice.

**B.      The Disclosed Information Is Not PII Because It Does Not Identify "Specific Video Materials or Services," As Required By The Statute.**

The VPPA defines PII as information that identifies a person as having "requested or obtained *specific* video materials or services." 18 U.S.C. § 2710(a)(3) (emphasis added). "Specific" means "definite; explicit; of an exact or particular nature." Black's Law Dictionary (6th ed. 1990). Thus, to qualify as PII, the disclosed information must identify the "*precise title*" of the video a person requested or watched. 1988 VPPA Joint Hearing, *supra*, at 32 (emphasis added); *see also Eichenberger*, 876 F.3d at 984 (PII "identifies an individual as having watched certain videos"); *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d at 285 (to violate the VPPA, the information disclosed by a VTSP must include "personally identifiable information that identifies a specific person and ties that person to *particular videos* that the person watched") (emphasis added); *Martinez v. D2C, LLC*, No. 23-21394-CIV, 2023 WL 6587308, at *3 (S.D. Fla. Oct. 10, 2023) (noting that the VPPA "requir[es] plaintiffs to allege … that *specific [video] titles* were

12

disclosed") (emphasis added); *In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1095 (N.D. Cal. 2015) ("The point of the VPPA, after all, is not so much to ban the disclosure of user or video data" but "to ban the disclosure of information connecting a certain user to certain videos.").

The Complaint does not allege that the Websites' disclosures identified the videos Plaintiffs allegedly requested or obtained; it claims the Websites disclosed *either* video titles *or subscriptions*. (Am. Compl. ¶¶ 1, 4, 5, 11, 16, 19, 35, 75, 80-82, 86, 93, 96, 100, 111). "Subscriptions"—such as Plaintiff Damrau's subscription to the "NY Social Work All Access Pass" (*id.* ¶ 16), involve a *set* of materials. The Complaint does not allege which video(s) in the subscriptions Plaintiffs actually viewed, if any. That does not meet the VPPA's requirements for PII. *See Gonzalez v. Central Elec. Co-op, Inc.*, Civ. Nos. 08–6236–HO, 08–6240–HO, 2009 WL 3415235, at *11 (D. Or. Oct. 15, 2009) (holding hotel did not violate the VPPA because it did not specifically identify which of 15 movies plaintiff purchased, and therefore had not disclosed PII).

Therefore, Plaintiffs' claim seeking damages for violations of the VPPA regarding the disclosure of PII as to subscriptions should be dismissed with prejudice.

### C. An Ordinary Person Could Not Identify PII From The Allegedly Disclosed Information.

The statute defines PII as "includ[ing] information which identifies a person as having requested or obtained specific video materials or services from a [VTSP];" i.e., information allowing identification of the consumer and the title of the prerecorded video they requested or obtained. 18 U.S.C. § 2710(a)(3). Such disclosure must be made in a form "that would readily

13

permit an *ordinary person* to identify a specific individual's video-watching behavior."[4] *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262 at 267 (emphasis added). *See also Eichenberger*, 876 F.3d at 985 (adopting "ordinary person" standard); *Wilson*, 598 F.Supp.3d at 91 ("the majority of the courts to address this issue" have found PII to mean "the kind of information that would readily permit an ordinary person to identify a specific individual's video-watching behavior.") (internal citations omitted).

The Complaint's unsupported, conclusory assertion that an ordinary person could use the Pixels' disclosures to identify the individual and the specific video material they requested or obtained (Am. Compl. ¶¶ 87, 108), is unequivocally refuted by the Complaint's specific allegations. *See, e.g.*, *Williams v. FCA US LLC*, No. 17-CV-00844-W-DW, 2018 WL 3973075, at *6, n.6 (W.D. Mo. Apr. 16, 2018) (noting that a complaint's conclusory allegation "is not entitled to any weight" where it is "inconsistent with Plaintiffs' specific and detailed allegations"); *see also DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 151-52 (2d Cir. 2014) (noting the court need not accept as true a complaint's general allegations "that are contradicted by more specific allegations") (internal quotations and citation omitted). The Complaint includes screenshots allegedly showing the actual disclosures the Pixels made. (*See* Am Compl. ¶¶ 16, 26, attached as Exhibits 1 and 2). The jumbled mess of computer code is gibberish to any non-expert. The Complaint itself tacitly recognizes as much: even with the cherry-picked, carefully presented screenshots, the Complaint recognizes the need to highlight (in red boxes) the relevant portions to

---

[4] The "ordinary person" test stands in contrast to a standard adopted only by the First Circuit, which focuses on whether the *actual recipient* of the disclosure would be able to use that information to identify the consumer and the specific video the consumer viewed. *Yershov v. Gannett Satellite Info. Network, Inc*., 820 F.3d 482, 486 (1st Cir. 2016). This distinction is often dispositive because, as discussed below, the ability of a sophisticated entity like Meta to interpret the convoluted, technical disclosures Plaintiff contends are made by the Pixels is vastly different than the ability of the ordinary person.

aid comprehension of what the screenshots purportedly show. *Id.*

The disclosures are coding gobbledygook that no "ordinary person" would understand. *See Edwards v. Learfield Commc'ns, LLC*, 697 F. Supp. 3d 1297, 1307-08 (N.D. Fla. 2023) (dismissing VPPA claim because "the complaint does not allege facts plausibly showing that the Website's pixel 'readily permit[s] an *ordinary person* to identify Plaintiffs' video-watching behavior … [The complaint] offer[s] no facts explaining how … doing so does not require technical expertise….") (emphasis in original). By the Complaint's own allegations and screenshots, the information that the Pixels allegedly transmitted does not allow an ordinary person to identify Plaintiffs' identity (through their Facebook and TikTok accounts), or the titles of any videos they requested or obtained.

## **CONCLUSION**

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated: January 23, 2025　　　　　　　　*/s IJay Palansky*
　　　　　　　　　　　　　　　　　　　IJay Palansky (*pro hac vice*)
　　　　　　　　　　　　　　　　　　　ipalansky@atllp.com
　　　　　　　　　　　　　　　　　　　ARMSTRONG TEASDALE LLP
　　　　　　　　　　　　　　　　　　　4642 S. Ulster Street, Suite 800
　　　　　　　　　　　　　　　　　　　Denver, Colorado 80237
　　　　　　　　　　　　　　　　　　　(720) 200-0676

　　　　　　　　　　　　　　　　　　　Paul Croker (Bar #57000)
　　　　　　　　　　　　　　　　　　　Nick Slovikoski (Bar #73019)
　　　　　　　　　　　　　　　　　　　pcroker@atllp.com
　　　　　　　　　　　　　　　　　　　nslovikoski@atllp.com
　　　　　　　　　　　　　　　　　　　ARMSTRONG TEASDALE LLP
　　　　　　　　　　　　　　　　　　　2345 Grand Blvd., Suite 1500
　　　　　　　　　　　　　　　　　　　Kansas City, Missouri 64108
　　　　　　　　　　　　　　　　　　　Telephone: 816.221.3420
　　　　　　　　　　　　　　　　　　　Fax: 816.221.0786

　　　　　　　　　　　　　　　　　　　COUNSEL FOR COLIBRI GROUP, LLC

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 23, 2025, the foregoing was filed electronically using the Court's CM/ECF system which will serve a copy upon all parties of record.

*/s/ IJay Palansky*
