# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| TRACEY DAMRAU and DANIELLE OSHEA, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br> v.<br><br>COLIBRI GROUP, LLC,<br><br>    Defendant. | Civil Action No. 4:24-cv-01441<br><br>**DEMAND FOR JURY TRIAL** |

## **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Plaintiffs Tracey Damrau and Danielle Oshea, by and through undersigned counsel, submit their opposition to Defendant's Motion to Dismiss.  *See* Defendant's "Motion to Dismiss" ("Motion" or "Mot."), Doc. [17].

## I. INTRODUCTION

Plaintiffs bring this consumer class action against Defendant for violation of consumers' privacy rights as established by the Video Privacy Protection Act ("VPPA"). Defendant's customers pay for subscriptions to access prerecorded videos and stand-alone prerecorded videos on various educational topics including nursing, healthcare, home inspection, engineering, appraisal, social work, occupational therapy, pharmacy, counseling, and other fields.  To increase its customer base and boost sales in the two years preceding the filing of this action, Defendant knowingly installed two snippets of programming code on its website and disclosed customers' personally identifiable information to third parties such as Meta Platforms, Inc. ("Meta") and TikTok Inc. ("TikTok").  The programming code for Meta is known as the Meta Pixel, which regularly disclosed Defendant's customers' personally identifiable information to Meta.  The programming code for TikTok is known as the TikTok Pixel, which regularly disclosed Defendant's customers' personally identifiable information to TikTok.  Plaintiffs allege that Defendant's disclosures of their (and numerous others) personally identifiable information violated the VPPA.  *See* 18 U.S.C. § 2710(b)(1).

Defendant has now moved to dismiss the Amended Action Complaint (the "Complaint") on two grounds.  First, the Motion argues Defendant is not the correct entity to be sued because it is neither the principal-agent nor the alter ego of any of the websites alleged in the Complaint. Second, the Motion argues Plaintiffs cannot state a claim under the VPPA because (a) "[e]ducational videos are not covered" by the VPPA, so Defendant is not a videotape service

1

provider; (b) "[t]he Complaint does not allege which video(s) in the subscriptions Plaintiffs actually viewed, if any[;]" and (c) no ordinary person would understand the disclosures made by the Pixels in this case. Defendant's Motion is entirely without merit. The Complaint's allegations demonstrate that Defendant is the appropriate party and that Plaintiffs have stated a claim under the VPPA consistent with the overwhelming majority of cases interpreting the same issues.

## II.     APPLICABLE LEGAL STANDARD

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court "must liberally construe a complaint in favor of the plaintiff," *Huggins v. FedEx Ground Package Sys., Inc.*, 592 F.3d 853, 862 (8th Cir. 2010), and "grant all reasonable inferences in favor of the nonmoving party." *Lustgraaf v. Behrens*, 619 F.3d 867, 873 (8th Cir. 2010). To survive dismissal, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *In re Crop Inputs Antitrust Litig.*, --- F.Supp.3d ----, No. 4:21-MD-02993 SEP, 2024 WL 4188654, at *4 (E.D. Mo. Sept. 13, 2024) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678.

## III.    ARGUMENT

### A.    Defendant is the Proper Party

"As a general rule, two separate corporations are regarded as distinct legal entities, even if the stock of one is owned partly or wholly by the other." *Weitz Co. v. MH Washington*, 631 F.3d 510, 520 (8th Cir. 2011). However, a parent corporation can be liable for the actions of its subsidiary in two circumstances: when the parent acts as the alter ego for the subsidiary or when

there is a principal-agent relationship. *See id.* To establish alter ego liability, a plaintiff must plead "(1) control and complete domination of policy and business practice with respect to the transaction attacked . . . (2) defendant used the control to commit fraud or wrong, to perpetrate the violation of a positive legal duty, or to commit a dishonest and unjust act; and (3) that control and breach of duty was the proximate cause of the injury or unjust loss." *Aware Prods. LLC v. Epicure Med., LLC*, No. 4:21-CV-00249 JCH, 2021 WL 4940922, at *2 (E.D. Mo. Oct. 22, 2021). To establish principal-agent liability, a plaintiff must plead that (1) the parent exercised "such domination and control that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal[,]" and (2) the parent's control over the subsidiary was "actual, participatory and total." *See Weitz*, 631 F.3d at 522. Plaintiffs have adequately alleged each element necessary for either theory, but because Defendant only challenges the "control" element, only that element is addressed below.

As an initial matter, courts within this District and Circuit have routinely refused to grant motions to dismiss when alter-ego or principal-agent liability allegations are in question because those issues "require[] a fact-intensive inquiry that cannot be resolved at the motion to dismiss stage." *Sigma-Aldrich Co., LLC v. Quantabio, LLC*, No. 4:22-CV-00090-JAR, 2023 WL 2645651, at *6 (E.D. Mo. Mar. 27, 2023); *Cass Com. Bank v. Cap. Tech. & Leasing, LLC*, No. 4:14-CV-307 RWS, 2015 WL 4775102, at *3 (E.D. Mo. Aug. 13, 2015); *Pietoso, Inc. v. Republic Servs., Inc.*, No. 4:19-CV-00397-JAR, 2021 WL 5177357, at *2 (E.D. Mo. Nov. 8, 2021); *Int'l Ass'n of Bridge v. Acme Erectors, Inc.*, No. 16-0488-CV-W-REL, 2016 WL 6089748, at *4 (W.D. Mo. Oct. 17, 2016). Notwithstanding the overwhelming majority of authority showing that a substantive determination of parent liability should be made at the summary judgment stage,

Plaintiffs have plausibly alleged facts which, taken as true, show that Defendant is liable under either theory.

Concerning alter-ego liability, the Complaint alleges "Defendant operates and maintains a portfolio of company and brand Websites, including www.elitelearning.com, www.homeceuconnection.com, www.colibrirealestate.com, www.mckissock.com, and www.fhea.com (the "Websites"), where it sells subscriptions to access prerecorded video content and individually priced prerecorded video content from various industries[.]" *See* Doc. [15] ¶ 33. The Complaint further alleges that Defendant is the "parent company that specifically governs" the subsidiary companies and brands and that Defendant chose to install the Meta Pixel and TikTok Pixel on the respective Websites. *See id.*, ¶¶ 2, 34. To detail that governance, the Complaint then alleges that Defendant has created a "Global Privacy Policy that applies to each Website and governs the data collection and use of information obtained on each" Website. *See id.*, ¶ 35. As further evidence of Defendant's control over the respective Websites, the Complaint alleges Defendant's Global "Privacy Policy specifically dominates all matters concerning privacy by directing any questions to privacy@colibrigroup.com rather than an email address for the individual Websites." *See id.*, ¶ 35. To detail the violation of law, the Complaint alleges "the tracking technology that Defendant intentionally installed on its Websites transmits the fact that a consumer purchased a prerecorded video or subscription to video materials or services alongside his or her FID or other personally-identifying information to Meta and TikTok, without the customer's consent [] in clear violation of the VPPA." *See id.*, ¶¶ 64,119.

These well-pled allegations of alter-ego liability mirror the allegations that have been found sufficient at the pleading stage. For example in *Pietoso, Inc. v. Republic Servs., Inc.*, the plaintiff alleged *inter alia* that the defendant (1) "completely controls and dominates Allied's performance

4

in connection with the Service Agreement[,]" (2) "handles all negotiations, customer inquiries, and record-keeping regarding the Service Agreement," and (3) "share[s] common management, corporate offices, and headquarters" with the subsidiary. *See* 2021 WL 5177357, at *2 (E.D. Mo. Nov. 8, 2021). That court found those allegations to be sufficient to "plausibly alleged alter ego liability." *See id.* Here, the Complaint specifically alleges Defendant completely controls and dominates the data collection of the subsidiaries through the Global Privacy Policy, which is akin to the service agreement in *Pietoso*. *See* Doc. [15] ¶ 35. Plaintiffs further allege that Defendant handles all privacy matters, inquiries, and procedures under the cover of a single email address. *See id.*, ¶ 35. For these reasons, the Complaint adequately alleges alter ego liability, just like the court held in *Pietoso*. The decisions of other courts confirm this conclusion. *See Scottrade, Inc. v. Variant, Inc.*, No. 4:13CV1710 RLW, 2015 WL 4605734, at *5 (E.D. Mo. July 30, 2015) (finding allegations sufficient when plaintiff alleges parent "had control over" the subsidiaries, had "used that control to secretly and fraudulently assign patent rights . . . in contravention of [the parent's] legal rights. . . [and the parent] lost monies owed."); *Int'l Ass'n of Bridge v. Acme Erectors, Inc.*, No. 16-0488-CV-W-REL, 2016 WL 6089748, at *4 (W.D. Mo. Oct. 17, 2016) (finding allegations sufficient when plaintiff alleges that defendants "share common management, control of labor relations, business purpose, operations, equipment, customers, supervision, ownership and financial control.").

Concerning principal-agent liability, the Complaint's allegations recounted above are also sufficient because unlike alter ego liability, "[c]omplete domination or control of the agent by the principal, however, is not required to establish an agency relationship." *Blanks v. Fluor Corp.*, 450 S.W.3d 308, 380 (Mo. Ct. App. 2014). The key is to focus "on the arrangement between the parent and the subsidiary, the authority given in that arrangement, and the relevance

5

of that arrangement to the plaintiff's claim." *See id*. Here, the Complaint alleges a specific arrangement – Defendant's Global Privacy Policy which unifies Defendant and its subsidiaries in their violation of the VPPA. *See* Doc. [15] ¶ 35. Defendant's subsidiaries are further alleged to have no independence, so they do not speak with a separate mind, will, or existence of their own because Defendant controls all data collection and privacy matters from a single parent email and leaves no autonomy to the subsidiary Websites. *See id.*, ¶¶ 36-37, 82. As further evidence of the subsidiary Websites' lack of independence, the Complaint alleges Defendant's installation of the Tracking Technologies causes "[e]ach of Defendant's Websites [to] operate in the same manner" in disclosing consumers' personally identifiable information. *See id.*, ¶¶ 3, 82. Accordingly, these well-pled allegations of principal-agent liability are sufficient to withstand Defendant's Motion to Dismiss, and the Motion should be denied.

Defendant argues this Court should undertake the fact-intensive inquiry at the pleading stage, but cites no factually or procedurally similar case that approves such an approach. Indeed, *Sigma-Aldrich Co.* explained that the few courts that have addressed the issue at the pleading stage did so because "the respective plaintiffs failed to make the necessary allegations to support an alter ego claim." *See* 2023 WL 2645651, at *6. Defendant relies on a single case, *Goellner-Grant v. Platinum Equity LLC*, 341 F. Supp. 3d 1022, 1030 (E.D. Mo. 2018), to support its position that the Complaint's allegations are insufficient to allege alter ego or principal-agent liability in this case. Defendant is mistaken.

*Goellner-Grant* is distinguishable for several reasons. First, *Goellner-Grant* is a wrongful death diversity case involving the question of specific personal jurisdiction. *See* 341 F. Supp. 3d at 1025. There, the court examined whether the plaintiffs had adequately alleged a Delaware-based parent entity "was in full control and dominion over [] its [] subsidiary, so as to result in [the

6

parent] being the mere alter-ego of [subsidiary]—a theory that, if sustained, causes [the parent] to be subject to this Court's jurisdiction by way of the underlying parent-subsidiary relationship notwithstanding the lack of [the parent's] own, direct contacts with Missouri." *Id*. In the present case, Defendant has not moved to dismiss on the grounds that there is a lack of personal jurisdiction, so that argument is waived, making *Goellner-Grant* factually inapplicable to this Court's assessment. *See e.g., Alger v. Hayes*, 452 F.2d 841, 842–43 (8th Cir. 1972) (personal jurisdiction "is a [] defense which may be waived if not timely asserted[.]"). Second, even assuming this Court examined the arguments made in *Goellner-Grant*, the plaintiffs in that case relied on external press release articles and macro-level management actions taken by the parent company (assisting in a rebranding initiative, shared business success, and involvement with subsidiary's customer base) to argue alter ego liability existed.[1] *See* 341 F. Supp. 3d at 1029. In the present case, the Complaint alleges Defendant directly created and maintains a global privacy policy for each Website that governs the subsidiary Websites' data collection practices and leaves no autonomy to the subsidiary Websites. *See* Doc. [15] ¶¶ 36-37, 82. Far from conclusory, the Complaint then explains directly how Defendant asserts total control over data collection for all of the Websites because they command that "any questions" be directed "to privacy@colibrigroup.com rather than an email address for the individual Websites." *See id.*, ¶ 37. In sum, the detailed and specific allegations unifying Defendant to its complete control and dominance over the subsidiary Websites by way of the Global Privacy Policy and the concomitant

---

[1] Should this Court consider the merits of Defendant's argument, Plaintiffs respectfully request a stay of the case and leave to conduct targeted discovery to confirm the allegations alleged in the Complaint. *See e.g., Radaszewski by Radaszewski v. Contrux, Inc.*, 891 F.2d 672, 675 (8th Cir. 1989) (reversing a district court's assessment of the sufficiency of alter ego allegations and permitting the plaintiff to take discovery on remand); *Fleishman-Hillard, Inc. v. McCombs*, No. 4:10-CV-676 CAS, 2011 WL 5039809, at *1 (E.D. Mo. Oct. 24, 2011) (ordering "the parties to engage in jurisdictional discovery to determine whether Flagship Group, LLC was the alter ego of defendants, and allowed the parties to renew their motions to dismiss after discovery.").

installation of the Tracking Technologies to violate the VPPA, are sufficient to establish Defendant is the proper defendant in this action.  Defendant's motion should be denied.

### B.  The Definition of "Videotape Service Provider" Covers Educational Videos

The VPPA defines "video tape service provider" as "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials[.]" 18 U.S.C. § 2710 (a)(4) (emphasis added). Defendant argues that it is not a "video tape service provider" within the meaning of the VPPA because "the VPPA was designed to prevent disclosure of *movies* individuals viewed" not educational videos.  *See* Doc. [17] at 10.  According to Defendant, only films that may result in a "public attack on individuals' character through public disclosure of their movie viewing habits" are actionable under the VPPA.  That argument is unsupported by the text or legislative history of the VPPA.

"The first question in interpreting a statute is whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *United States v. Kowal*, 527 F.3d 741, 746 (8th Cir. 2008) (internal quotation marks omitted).  "If the plain language of the statute is unambiguous it controls." *Doe v. Dep't of Veterans Affs. of U.S.*, 519 F.3d 456, 461 (8th Cir. 2008).  Contrary to what the Motion suggests, "[s]tarting with legislative history and purpose, however, is no way to read a statute." *United States ex rel. Cairns v. D.S. Med. LLC*, 42 F.4th 828, 836 (8th Cir. 2022).

Beginning with the plain text of the VPPA, Defendant's argument that the statute only regulates "movies" capable of resulting in a "public attack on individuals' character through public disclosure of their movie viewing habits" is an extremely narrow reading that would render the second half of the sentence "similar audio visual materials" superfluous.  The statutory definition

8

of "video tape service provider" includes providers of any "audio visual materials" that are "similar" to "prerecorded video cassette tapes" – without imposing any requirement that such materials be "movies" let alone capable of resulting in a "public attack on individuals' character through public disclosure of their movie viewing habits." The word "material" is defined "both as 'relating to substance' and as 'Text or images in printed or electronic form; also with distinguishing word, as reading material, etc.'" *In re Hulu Priv. Litig.*, No. C 11-03764 LB, 2012 WL 3282960, at *5 (N.D. Cal. Aug. 10, 2012) (quoting Oxford English Dictionary, Third Edition, March 2001). And the word "similar" is defined as "[a]lmost the same, but not identical." *See* Similar, WEBSTER'S DICTIONARY 223 (digital archive 1988 ed.), available at https://archive.org/details/webstersdictiona0000unse_i9t3/. Thus, "similar audio visual materials" means any prerecorded audio visual material that is almost the same as, but not identical to, prerecorded video cassette tapes, including prerecorded educational videos, regardless of the reputational impact of watching said material. *See e.g., In re Hulu Priv. Litig.*, 2012 WL 3282960, at *5 ("a plain reading of a statute that covers videotapes and 'similar audio visual materials' is about the video content[.]"). Indeed, the Court in *Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714, 719 (N.D. Cal. 2023), rejected the very argument that Defendant makes in this case that "length or subject matter of a video is relevant to determining coverage by the VPPA." In rejecting that argument, the court held that education-focused videos were "similar audio visual materials." Thus, the plain text of the VPPA establishes that educational videos fall within that definition.[2]

---

[2] In a footnote, Defendant argues that this Court can and should consider the cookie policies of the subsidiary Websites because of "the Complaint's extensive references." However, the Complaint does not reference any cookie policy at all. *See e.g., Lewis v. Exec. Dining LLC*, No. 4:20-CV-01261-SEP, 2021 WL 3847136, at *4 (E.D. Mo. Aug. 27, 2021)(refusing to incorporate matters not plead in or embraced by pleadings). Defendant has also failed to offer any evidence that Plaintiffs were presented with or manifested their assent to be bound by any policy on Defendant's website. Mere presentation of a policy on a website constitutes a browsewrap agreement that courts regularly reject as insufficient to form a binding contract. *See generally*, *Foster v. Walmart, Inc.*, 15 F.4th 860, 864 (8th Cir. 2021) (explaining that browsewrap agreements require an assessment of the presentation of the website); *Dyer v. Nw.*

The VPPA's legislative history and purpose also support that conclusion. Congress enacted the VPPA "to preserve personal privacy with respect to the rental, purchase, or delivery of video tapes or similar audio visual materials." *See* Pub. L. No. 100–618, preamble; S. Rep. No. 100–599, at 5 (1988), reprinted in 1988 U.S.C.C.A.N. 4342–1. Indeed, "the Senate Report [concerning the VPPA] confirms that Congress was concerned with protecting the confidentiality of private information about viewing preferences regardless of the business model or media format involved." *In re Hulu Priv. Litig.*, 2012 WL 3282960, at \*6 (citing S. Rep. No. 100–599 at 1 (VPPA follows a long line of statutes passed by Congress to extend privacy protections to records that contain information about individuals); *id.* at 3 (quoting Senator Leahy's denouncement of the disclosures: "It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read.... In an era of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch.... I think that is wrong, I think that is Big Brother, and I think it is something we have to guard against"); *id.* at 2–4 (extensive discussion of privacy, including Supreme Court case law and noting that protecting an individual's choice of books and films is a pillar of intellectual freedom under the First Amendment).

Against this backdrop, the Complaint adequately alleges that Defendant – a company engaged in the business of selling or delivering educational videos – is a "videotape service provider" as defined under the VPPA. *See* Doc. [15] ¶¶ 33, 64, 81. This Court should reject Defendant's argument to the contrary because Defendant principally relies on *Aldana v.*

---

*Airlines Corps.*, 334 F. Supp. 2d 1196, 1200 (D.N.D. 2004) ("broad statements of company policy do not generally give rise to contract claims.").

*GameStop, Inc.*, No. 22-CV-7063-LTS, 2024 WL 708589, at *6 (S.D.N.Y. Feb. 21, 2024), which stands for the exact opposite of Defendant's argument. Indeed, *Aldana* extends the VPPA to video games and shorter "cut scene" videos used to move the storyline forward. *See id.* ("the 'cut scenes' in video games are clearly 'video content' covered by the VPPA, even if they are accompanied by the active game elements of the video games that GameStop sells."). Defendant's brief citation to *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017), is equally unavailing because it addresses only what constitutes "personally identifiable information" under the VPPA and "video service providers" obligation not to disclose "personally identifiable information." *Eichenberger* simply does not examine any word, phrase, or term within the definition of "video service provider." Therefore, Defendant's motion should be denied.

### C.  Plaintiffs Adequately Allege Disclosure of Personally Identifiable Information

The VPPA defines "personally identifiable information" as "information which identifies a person as having requested or obtained specific video **materials** **or** **services** from a video tape service provider." 18 U.S.C. § 2710(a)(1). The gravamen of Defendant's argument is that Plaintiffs' VPPA claims fail because they do not allege "the Websites' disclosures identified the videos Plaintiffs allegedly requested or obtained[.]" *See* Doc. [17] at 13. Defendant specifically argues "Plaintiff Damrau's subscription to the "NY Social Work All Access Pass" is insufficient to state a claim under the VPPA because it does not identify specific video titles. *See id*.

This argument fails for two reasons. First, Plaintiff Oshea has identified the specific video **material** she purchased, the "Managing Professional Boundaries" course, *see* Doc. [15], ¶ 25, and Plaintiff Damrau has identified the specific video **services** she purchased, the "NY Social Work All Access Pass." *See* Doc. [15], ¶ 15. It also fails because the Complaint specifically alleges that "[d]uring the purchase process on any one of Defendant's Websites, Defendant uses – and has

11

used at all times relevant hereto – the Meta Pixel to disclose to Meta the unencrypted FID of the person who made the purchase and the subscription title or specific title of video material that the person purchased (as well as the URL where such video material is available for purchase)." *See id*., ¶ 85. Courts across this nation have found similar allegations sufficiently allege disclosure of personally identifiable information. *See e.g., Feldman v. Star Trib. Media Co. LLC*, 659 F. Supp. 3d 1006, 1020–21 (D. Minn. 2023) (finding allegation that "each time Mr. Feldman has watched video content on startribune.com, the Star Tribune 'simultaneously disclosed [his Facebook ID] and the name of the video/content that he viewed to Facebook via Facebook Pixel'" sufficient); *Golden v. NBCUniversal Media, LLC*, 688 F. Supp. 3d 150, 160 (S.D.N.Y. 2023) ("the FAC also adequately alleges that Today.com disclosed "specific video materials"—to wit, each video's URL and name."); *Harris v. Pub. Broad. Serv.*, 662 F. Supp. 3d 1327, 1335 (N.D. Ga. 2023) (same).

Defendant's reliance on *Gonzalez v. Cent. Elec. Co-op, Inc.*, No. CIV. 08-6236-HO, 2009 WL 3415235, at *11 (D. Or. Oct. 15, 2009), is misplaced because the case supports Plaintiffs' position. In *Gonzalez*, the former president and CEO of a company moved for a protective order for the company's alleged violation of the Video Privacy Protection Act because it obtained a list containing the prices of movies available for rent in rooms at the Doubletree Hotel of Portland, fifteen of which are priced at $14.99 (nine are rated mature). *See id.* at 10. The company also obtained the former CEO's folio listing that he purchased a movie for $24.95 and another for $14.99. *See id.* The court denied the former CEO's motion finding that (1) "the combined Doubletree evidence indicating that plaintiff purchased one of fifteen movies does not constitute personally identifiable information," (2) the company lacked a "compelling need for this evidence," and (3) it is inadmissible if obtained in violation of the VPPA. *See id.* at 11. *Gonzalez* favors Plaintiffs in a different sense because that court stated, "'personally identifiable

12

information' is intended to refer to information that identifies a particular person as having engaged in a specific transaction with a videotape provider." Because Plaintiffs specifically allege the titles of the specific videos and video services are disclosed alongside the URL where they are available for purchase, this "identifies a particular person as having engaged in a specific transaction with a videotape provider" as explained in *Gonzalez*. Defendant's motion must be denied.

### D. Plaintiffs Adequately Allege the Connection between the Personally Identifiable Information and the Plaintiffs' Identities

In a final attempt to secure dismissal of the Complaint, Defendant argues no ordinary person would understand the Meta Pixel and TikTok Pixel's disclosures because it is "coding gobbledygook." *See* Doc. [17] at 15. Defendant's argument fails for three reasons.

First, Defendant fails to create a conflict between the well-pled allegations in the Complaint and the tester screenshots included merely as examples of the disclosures. The Complaint specifically alleges the mechanics of the Meta Pixel and how Defendant's programming of it discloses a consumer's FID, the title of the specific video or subscription (URL where available), and how any person can connect the two by "simply by accessing the URL www.facebook.com/ and inserting the person's FID." *See* Doc. [15], ¶¶ 4, 87. To bolster these allegations, Plaintiffs include a tester disclosure of the product-identifying information being sent as Defendant's website executes a GET request to Facebook's tracking URL. The screenshot disclosure is similar to the tester disclosure of source code used in other cases. *See Golden*, 688 Supp. 3d at 160-61 n.10; *Cantu v. Tapestry, Inc.,* No. 22-CV-1974-BAS-DDL, 2023 WL 4440662, at *4 (S.D. Cal. July 10, 2023). The Court in *Golden* specifically rejected arguments that the source code contradicted well-pled allegations because there was overwhelming case law to demonstrate a Facebook ID is personally identifiable. *See Golden*, 688 Supp. 3d at 160 (collecting cases). The

13

Complaint's allegations concerning TikTok are equally sufficient, *see* Doc. [15], ¶¶ 5, 108, because cellular phone numbers and emails are personally identifying.  *See Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016) (finding that disclosure of a phone number *inter alia* is personally identifying information); *Lebakken*, 640 F. Supp. 3d at 1342 (finding that disclosure of inter alia an email address is personally identifying information); *see Hausburg v. McDonough*, No. 8:20-CV-2300-JSS, 2023 WL 2432322, at *1 (M.D. Fla. Mar. 9, 2023) (finding email addresses were personally identifiable information such that good cause exists to seal filings in a federal employment action); *see generally Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 981 (9th Cir. 2017) (declaring that "an email address may very well readily enable an 'ordinary person' to identify an individual" but leaving the question for another day); *Smith v. Trinity Broad. of Texas, Inc.*, No. 8:24-CV-01046-JVS-ADS, 2024 WL 4394557, at *2 (C.D. Cal. Sept. 27, 2024) ("Other PII that enables an ordinary person to identify an individual may include an individual's name and telephone number, an individual's name and birthday, GPS coordinates of a particular device, a Facebook link, or an email address.").

Second, this Court should reject the ordinary person test because it is not the law of this Circuit, and this Court need not apply such a standard because it contravenes the plain language and statutory history of the VPPA.  *See e.g.*, *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1226 (C.D. Cal. 2017) ("The Court finds *Yershov* to be a more persuasive interpretation of the VPPA than *In re Nickelodeon* . . . [because] *Yershov* focused foremost on the text of the statute, while *In re Nickelodeon* turned quickly to "the more controversial realm of legislative history."); *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1256 (11th Cir. 2015); *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016) ("Nevertheless, the language reasonably conveys the point that PII is not limited to information that explicitly names

14

a person. Had Congress intended such a narrow and simple construction, it would have had no reason to fashion the more abstract formulation contained in the statute."). The reasonableness standard developed and applied by the First Circuit in *Yershov* better accords with the text of the statute and the Congressional goals underlying it. *See Yershov*, 820 F.3d at 486.

Third, Defendant's reliance on *Edwards v. Learfield Commc'ns, LLC*, 697 F. Supp. 3d 1297, 1308 (N.D. Fla. 2023) is flawed. While *Edwards* is a VPPA case, it involved pleading deficiencies that are not present in Plaintiffs' Complaint. For example, *Edwards* recognized that the website's transmission "may contain video titles," but the *Edwards* plaintiff offered "no facts explaining how Facebook accesses that metadata, why doing so does not require technical expertise, or how much metadata Facebook has to comb through to discover someone's c_user ID and the video titles." *See id*. Here, the Complaint alleges all Facebook IDs, pertaining to all of Meta's subscribers (including Plaintiffs), are personally identifying because every Meta subscriber has an FID, every Meta subscriber's FID (including Plaintiff's FID) is indexed to that subscriber's Meta account page, and that every subscriber's (including Plaintiff's) Meta account page reveals the subscriber's first and last name, birth date, gender, and phone number or email address. *See* Doc. [15], ¶¶ 4, 65, 71-72, 87. Indeed, courts routinely and overwhelmingly have held that these allegations are sufficient at the pleading stage. *See Feldman*, 659 F. Supp. 3d at 1021 (collecting cases); *Golden*, 688 Supp. 3d at 160; *Harris*, 662 F.Supp.3d at 1334. *Edwards* is inapplicable on the facts alleged in the Complaint. Defendant's Motion should be denied.

## IV.   CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that the Court deny Defendant's motion to dismiss in its entirety.

Respectfully submitted,

Dated: February 27, 2025                          **HEDIN LLP**

                                                     /s/ *Elliot O. Jackson*
                                                      Elliot O. Jackson
                                                      MO Reg. No. #1034536FL
                                                      1395 Brickell Ave., Suite 610
                                                      Miami, Florida 33131-3302
                                                      Telephone:    (305) 357-2107
                                                      Facsimile:    (305) 200-8801
                                                      ejackson@hedinllp.com